MALCOLM M. JAMIESON *et al.*

*v.*

MARY WALLACE.

*Filed at Ottawa May 11, 1897—Rehearing denied October 12, 1897.*

1. CONTRACTS—*for purchase and sale of stocks to be settled by payment of differences are void.* A contract for the purchase and sale of stocks between parties who have no intention of receiving or delivering them, but intend to settle by the payment of differences between the contract price of the stocks and their market price when sold, is a gambling contract, and cannot be enforced.

2. SAME—*intention of both parties to settle transaction by payment of differences must be shown.* To invalidate a contract for the purchase and sale of stocks in the future, the intention of both parties to settle the transaction by the payment of differences must be shown.

3. SAME—*intention of parties to settle contract by payment of differences is a question of fact.* The intention of the parties to a contract for the purchase and sale of stocks may be established, not merely by their assertions, but from all the circumstances attending the transaction, and is a question to be determined by the jury, or by the court in trials without a jury.

4. EVIDENCE—*contract construed in the light of former dealings between the parties.* In determining the intention of the parties to a·contract for the purchase and sale of stocks, the fact that the parties have had similar transactions which were settled by the payment of differences may be considered.

5. SAME—*pecuniary ability of purchaser is considered in determining the intention of parties.* The fact that the purchase of stocks through a broker is much larger in amount than the purchaser is able to pay for, which fact is known to the broker, is a strong circumstance tending to show that there was no intention that the stocks were to be delivered to the purchaser.

6. PRINCIPAL AND AGENT—*no agency in the doing of an unlawful act.* Where a party makes a gambling contract with a broker to buy and sell stocks, both parties to the contract are principals, as there can be no such thing as agency in the doing of an unlawful act.

7. EQUITY—*bill for accounting and relief lies against broker selling securities deposited to cover loss on gambling contract.* A broker selling securities deposited with him by a party to cover losses on a gambling contract between them for the purchase and sale of stocks is a "winner," within the meaning of section 132 of the Criminal Code, (Rev. Stat. 1874, p. 372,) and a bill in equity for accounting and relief lies against him.

*Jamieson v. Wallace,* 60 Ill. App. 618, affirmed.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. M. F. TULEY, Judge, presiding.

This is a bill, filed on September 6, 1893, by the appellee, Mary Wallace, against the appellants, Malcolm M. Jamieson, Roland C. Nickerson, Irving H. Waggoner and Henry F. Billings, doing business under the firm name of Jamieson & Co. The bill alleges, that the defendants were stock brokers in Chicago, engaged in the business of buying and selling stocks; that, on December 5, 1892, the defendants contracted to give the complainant the privilege of dealing in Chicago Gas Company's stock with, or through them; that, if there was a loss, the complainant was to pay it to defendants, and, if there was a gain, defendants were to pay it to complainant and for their services charge a commission; that the method of conducting the business was unknown to complainant, and that it was understood and agreed between them that none of the stock should be delivered to her, or be paid for by her, but that defendants should adjust such deal with her by settling the difference or differences between the market value of such stock at the time of such deal and the time of closing it up and settling with her; that no time was agreed upon when such deal should be closed, but that was left to the option of the defendants; that, on January 17, 1893, under like circumstances and upon a like agreement, defendants suggested to her to deal in Chicago, Milwaukee and St. Paul railway stock; that about December 5, 1892, Jamieson & Co. reported to her, that they had purchased for her one hundred shares of the Chicago Gas Company's stock at ninety-four cents on the dollar, amounting to $9412.50, and afterwards reported to her, that on January 17, 1893, they had purchased for her one hundred shares of the Chicago, Milwaukee and St. Paul railway stock at eighty

and three-quarters cents on the dollar, amounting to $8087.50.

The bill then alleges, that defendants never received such stock into their possession, nor offered to deliver it to complainant, nor demanded payment therefor from her; that said stock afterwards declined in value, and, as it so declined, defendants demanded of her money or collaterals to make good the margins or decline in the same, and that in pursuance of such demand she delivered to them the following securities, to-wit: two bonds of the Consolidated Packing Company, of the par value of $1000.00 each; two bonds of the Consumer's Gas Company, of the par value of $1000.00 each; five bonds of the Hyde Park Gas Company, of the par value of $500.00 each; one bond of the Santa Fe Elevator and Dock Company, of the par value of $500.00; also ten shares of the Milwaukee and Chicago Breweries Company's stock, of the par value of about $50.00 each; and also eight shares of the West Chicago Street Railroad Company's stock, at the par value of $100.00 each, the face value of all being about $8300.00; that said securities constituted nearly her entire estate; that, upon her inability to deliver them any more securities to make good the margins or decline, they informed her that they had sold said Chicago, Milwaukee and St. Paul railway stock at forty-eight and one-half per cent of the par value, and had sold the Chicago Gas Company's stock at forty-eight per cent of the par value thereof, and that complainant was indebted to them in the sum of $7851.84; and they informed complainant that they had sold the two bonds of the Consumer's Gas Company of the face value of $2000.00, at sixty-eight per cent of the par value thereof.

The bill alleges, that complainant has made demand for the return to her of the collaterals so pledged by her to defendants, and they had refused to comply with said demand and had converted said collaterals to their use; that, if said purchases of said two hundred shares of the

gas company's stock and of the railway stock were ever made as claimed by defendants, the said purchases were gambling transactions under the statutes of Illinois, and that the pledge of said collaterals by her to them was based upon the said gambling transactions and is null and void, and that the complainant is entitled to the return of the collaterals so pledged; that her investment in said collaterals was intended to be permanent, and that the same were held by her for the purpose of drawing the dividends and interest arising therefrom; that defendants have never lost anything by reason of said transactions and have never paid anything to any person on account of such pretended purchases on her behalf; that it is necessary to have a production of the books of the defendants, and to have the same examined, for the purpose of an accounting in reference to said collaterals.

The bill prays for an injunction restraining defendants from selling said collaterals so pledged to them, and for an order compelling the defendants to produce their books and accounts and for a decree, declaring said transactions to be gambling ones and to be null and void, and requiring defendants to return to her all of said collaterals or their equivalent; and that an accounting may be had between the parties, and that complainant may have judgment for the amount due to her, or to which she may be entitled in case any of said collaterals may be out of their power to return to her.     The bill also prays for general relief.

The answer of the defendants denies the substantial allegations of the bill, and alleges, that, on December 5, 1892, upon the order of the complainant, the defendants bought for her one hundred shares of the Chicago Gas Company's stock, and, on January 17, 1893, bought for her, upon her order, one hundred shares of the Chicago, Milwaukee and St. Paul Railway Company's stock; that the same were bought for her by them and paid for by them upon the understanding, that she would take the

same and pay for them; that they notified her of said purchases; that she informed them, that she was unable to pay for the same, and delivered to them as security against loss to them from shrinkage in the value of said shares of stock the collaterals named in said bill; that in July, 1893, the stock of said gas company and of the railway company greatly shrunk in value, as did the said collaterals pledged with the defendants; that defendants gave complainant notice of such shrinkage and requested her to furnish additional security, but, upon being informed that she was unable to do so, they sold said shares of stock of the Chicago Gas Company, and the Chicago, Milwaukee and St. Paul Railway Company on July 27, 1893, and gave her notice of such sales. The answer admits, that complainant has made demand for the return of said collaterals, and that defendants have refused to comply with such demand.

The cause was referred to a master in chancery, who took testimony and made a report in the case. The master found, that there was no intention on the part of defendants or the complainant that said two hundred shares of stock should be delivered to her or paid for by her, and that, therefore, the transaction as to each of the purchases of stock was a gambling contract. The master also found in his report, that, inasmuch as said transactions were gambling contracts, the complainant was entitled to recover back her collaterals delivered as margins to the defendants; and that she was entitled to the return of such collaterals as had not been sold by the defendants, and to an accounting from them as to those of them which had been sold.

After hearing had upon report of the master, and upon evidence taken by him, the court rendered a decree, confirming the report of the master and overruling the exceptions thereto. The court found in its decree, that the transactions in reference to the purchases of said two hundred shares of stock were gambling contracts and ille-

gal and void; that, at the time of such purchases, there was no intention, on the part of defendants or of the complainant, that said stock should be delivered by them to her, or accepted or paid for by her, but that it was intended as between them that she should speculate in the rise and fall of the value of said stocks and receive the profits if any, and bear the losses, if any, arising out of such transactions; that it was their intention, that a settlement was to be ultimately made between them upon the basis of the difference between the amount paid by them for said stock and the amount for which they should sell said stock at some future time. The decree also found, that, on August 17, 1893, the defendants sold the two bonds of the Consumer's Gas Company for $1376.37; and that there was due from the defendants to complainant for the proceeds of such sale and interest thereon, and for dividends and interest collected upon the other collaterals, the sum of $2259.42; that defendants still have in their possession all of the collaterals so pledged with them except the said Consumer's Gas Company's bonds. It was thereupon ordered by said decree, that complainant should recover of the defendants said sum of $2259.42 and have execution therefor; and that defendants should surrender to her the other securities, except the two Consumer's Gas Company's bonds sold by them.

From the decree so rendered by the circuit court the defendants took an appeal to the Appellate Court. The Appellate Court has affirmed the decree of the circuit court and the present appeal is prosecuted from such judgment of affirmance rendered by the Appellate Court.

EGBERT JAMIESON, and JOHN A. ROSE, for appellants:

One who gives a verbal order to his broker to purchase certain stock, in pursuance of which the broker purchases the stock, and the same is on the following day delivered to and paid for by him, cannot insist that the contract is void. *Rogers* v. *Gould,* 6 Hun, 329.

The intention of the parties gives character to the transaction; and if either one of the parties contracts in good faith, he is entitled to the benefit of the contract so made, no matter what may have been the secret purpose or intention of the other party. *Pixley* v. *Boynton*, 79 Ill. 351.

The fact that transactions on the board of trade are closed out before maturity is no proof that delivery was not intended, and the fact that the transactions were closed by the payment of differences is not conclusive evidence that the transactions were gambling affairs. *Fox* v. *Steever*, 55 Ill. App. 255.

PENCE & CARPENTER, for appellee:

The question of intention of the parties to a contract is one of fact, and is to be ascertained like any other fact,—from all the evidence legitimately submitted. 8 Am. & Eng. Ency. of Law, 1005-1010; *Gregory* v. *Wendell*, 39 Mich. 337; *Ruchizky* v. *DeHaven*, 97 Pa. St. 202; *North* v. *Phillips*, 89 id. 250; *Irwin* v. *Milliar*, 110 U. S. 509; *Grizewood* v. *Blaine*, 11 C. B. 526; *In re Green*, 7 Biss. 328; *Beveridge* v. *Hewitt*, 8 Ill. App. 467; *Tenney* v. *Foote*, 4 id. 594; *Griswold* v. *Gregg*, 24 id. 394; *Carroll* v. *Holmes*, id. 453; *Commercial Bank* v. *Spaids*, 8 id. 493; *Doxy* v. *Spaids*, id. 549; *Brand* v. *Henderson*, 107 Ill. 141; *Cochran* v. *Ellis*, 125 id. 496; *Tenney* v. *Foote*, 95 id. 99; *Miles* v. *Andrews*, 40 Ill. App. 165; *Pearce* v. *Foote*, 113 Ill. 228.

All contracts made between parties who have no intention of receiving and delivering the property, but intend merely to settle accounts by the payment of differences, are void, and will not be enforced. Am. & Eng. Ency. of Law, 1005.

Transactions in stocks by way of margins, settlement of the differences and payment of the gain and loss, without the intention to deliver the stocks, are mere wagers, and therefore will not be sustained. *Ruchizky* v. *DeHaven*, 97 Pa. St. 202.

If, at the time of entering into a contract for the sale of personal property for future delivery, it be contemplated by both parties that at the time fixed for delivery the purchaser shall merely receive or pay the difference between the contract and the market price, the transaction is a wager, and nothing more. *Irwin* v. *Milliar*, 110 U. S. 507.

There is and can be no such thing as agency in the perpetration of crime or misdemeanor, or, indeed, doing an unlawful act. *Pearce* v. *Foote*, 113 Ill. 228.

Mr. CHIEF JUSTICE MAGRUDER delivered the opinion of the court:

According to the contention of the appellants in this case, they purchased for appellee, on December 5, 1892, one hundred shares of the Chicago Gas Company's stock at $94.00 per share, making, with commissions, $9412.50, and, on January 17, 1893, purchased for her one hundred shares of the Chicago, Milwaukee and St. Paul Railway Company's stock at the cost, including commissions, of $8087.50, making the total amount of the purchases of the two hundred shares of stock $17,500.00. On July 27, 1893, appellants claim that, through a firm in New York City, they sold for appellee the one hundred shares of railway stock for $4850.00 and the one hundred shares of gas company's stock at $4800.00, making a total of $9650.00. The total amount of the loss, as represented by the difference between the purchases and the sales, is $7850.00. The latter amount is claimed by appellants to be due from appellee, and, to reimburse themselves, they claim the right to retain the securities delivered by her to them as margins.

The main question presented by the record is, whether or not the agreement between appellants and appellee with reference to the purchase of said two hundred shares of stock was a gambling contract. The master, to whom the cause was referred by the circuit court, and the cir-

cuit court and the Appellate Court have found the transaction to be a gambling transaction. It is well settled, that, where a contract for the delivery and sale of stocks or other property in the future is not made with the intention that such stocks or property shall be received or delivered but with the understanding, either express or implied, that the transaction shall be settled by the payment of the difference between the contract price and the market price at the time fixed, or at some future time, such a contract is a mere wager or gambling contract, and is void. (*Schneider* v. *Turner,* 130 Ill. 28; *Pope* v. *Hanke,* 155 id. 617, and cases there cited). "All contracts made between parties, who have no intention of receiving and delivering the property, but intend merely to settle accounts by the payment of the differences, are void and will not be enforced." (8 Am. & Eng. Ency. of Law, 1005-1010). In order to invalidate the contract, it must appear that neither party has the intention to deliver the property, and that both parties have the intention of settling the differences only. But the intention of the parties in this regard may be established, not merely by their assertions, but by all the attending circumstances of the transaction. The question of intention is a question for the jury or for the court, to be determined by a consideration of all the evidence. (*Pope* v. *Hanke, supra*). The intention of the parties in such cases may be determined from the nature of the transaction, and from the manner and method of carrying on the business. (*Irwin* v. *Milliar,* 110 U. S. 507; *Gregory* v. *Wendel,* 39 Mich. 327; 8 Am. & Eng. Ency. of Law, 1010; *North* v. *Phillips,* 89 Pa. St. 250; *Ruchizky* v. *DeHaven,* 97 id. 202; *Beveridge* v. *Hewitt,* 8 Ill. App. 467; *Griswold* v. *Gregg,* 24 id. 384; *Carroll* v. *Holmes,* id. 453; *Kennedy* v. *Stout,* 26 id. 133; *Miles* v. *Andrews,* 40 id. 155; *Pearce* v. *Foote,* 113 Ill. 228; *Brand* v. *Henderson,* 107 id. 141; *Tenney* v. *Foote,* 95 id. 99; *Cothran* v. *Ellis,* 125 id. 496). An examination of the authorities above referred to will show, that the intention of the

parties may be determined from a variety of circumstances. Among these circumstances, besides the mode of dealing between the parties, is the pecuniary ability of the party purchasing. If the purchases of a party, as ordered through a broker, are larger in amount than he is able to pay for, it is a strong circumstance indicating that there was no intention of receiving the property, but rather an intention to settle the difference between the market price and the contract price. Such intention may be also inferred where the party, making the purchase, never calls upon the party, ordering the purchase, for the purchase money, but only for margins. It makes no difference, whether the real intention is formally expressed in words or not, if the facts and circumstances in proof show, that it was the real understanding, that there should be no actual purchase and no delivery or acceptance of the property involved in the contract, but merely an adjustment of damages upon differences.

After a careful examination of the evidence in this record, we are of the opinion that the finding of the lower courts was justified by the testimony. The appellee was a woman who had little or no experience in business. She had known the appellants for many years. One of the appellants had lived in her family, and both of them had been friends of herself and her family. She was a woman of very limited means. When she first began to operate through the appellants, she had only about $3600.00 inherited from her husband. Shortly thereafter she inherited a further sum of about $4000.00 from her father's estate, but at no time did her total capital exceed about $7500.00. From her relations to the appellants and from all the circumstances disclosed by the proof, it is impossible to believe that they were not well acquainted with the limited extent of her means. A woman, who was not in active business and had only $7500.00 in money, could not have been expected to take and pay for stocks amounting in value to $17,500.00.

Appellants never made any inquiry of her as to her financial ability. They never tendered to her at any time the stocks, which they claim to have purchased for her, nor asked her for any money to pay the purchase price of such stocks. She swears that she did not understand that the stocks proposed to be purchased were to be paid for by her; that appellants said nothing to her about delivering the stocks to her, and never offered to deliver them to her, and never told her how long the stocks would be carried. Before the purchase of the two hundred shares of stock here in controversy, appellee had had four other transactions with appellants. In January, 1892, they had purchased for her one hundred shares of the West Chicago Street Railroad Company's stock of the value of $13,243.75, and shortly thereafter had sold the same, receiving a profit of $201.01, which they paid to her. In July, 1892, they had a second transaction with her in the same kind of stock, on which she received as profit from them about $371.84. In August, 1892, she had a third like transaction with the appellants in the same kind of stock, on which she received as a profit from them $571.12. In September, 1892, she had a fourth like transaction with them in the same kind of stock, on which she received as a profit from them $39.74. In all of these transactions the shares were bought in each case at a higher price than $13,000.00, and in the last transaction the shares were bought at $205.00 a share, making with commissions $20,535.00. In making purchases for amounts so far beyond the pecuniary means of appellee, it is impossible that appellants should not have known her inability to pay for the stocks so purchased for her, and therefore must have intended merely to settle the accounts by the payment of the differences, they to pay the profits, if there were any, to her, and she to pay the losses, if there were any, to them. She swears, that she never intended to receive the stock so purchased by her, and that she was told by one of the defendants that he

could make some money for her by speculating in such stocks, or by "scalping," as he expressed it. The appellants deny, that they made use of any such word as "scalping," but they evidently did not expect that there would be an actual delivery of the stocks by them to appellee.

It is claimed by appellants, that they made actual purchases of the stocks. They were represented in New York by brokers by the name of Fowler & Co. They telegraphed to New York to Fowler & Co. to purchase the stocks. The stocks were never delivered to appellants, who lived in Chicago. If the stocks were actually purchased, they remained in New York. Fowler & Co. did not make the purchases for the account of the appellee, nor did they know anything about appellee in the transaction. It is not entirely clear, that there was an actual delivery of the stock to Fowler & Co. The witness, who testifies to buying it, says: "It was *understood* to be paid for in full on delivery." If the stock was in the possession of Fowler & Co., it would appear that it was pledged by them with some bank for the purpose of raising money, either to pay for such stock, or otherwise; at any rate, it is not clear that the stock could have at any time been obtained from New York by appellants, if they had desired to tender it to appellee. But whatever may be the fact as to the nature of the transaction between the appellants and those representing them in New York, so far as the transactions now involved are concerned appellants and appellee were principals. The contract between the appellee and the appellants is the only contract, which can be regarded in the decision of this case. It matters not, whether Jamieson & Co. actually bought the stock in question or not. As was said in *Pearce* v. *Foote*, 113 Ill. 228: "There is and can be no such thing as agency in the perpetration of crime or misdemeanor, or, indeed, doing an unlawful act. All persons actively participating are principals." Therefore,

the suggestion that appellants merely acted as the agents for appellee in these unlawful transactions, may be rejected at once as having nothing in its support. (*Pearce* v. *Foote, supra*). The question here in issue is with reference to the dealing and understanding between the appellants and appellee, and not in regard to the knowledge and understanding of parties in New York. If the understanding between appellants and appellee was that the deal as between themselves should be settled upon differences, and that there should be no delivery of the stocks, then the contracts as between them were gambling contracts, and within the statute. "The doctrine of agency has no application to the matter, so far as the question of the violation of this penal statute is concerned." (*Carroll* v. *Holmes, supra*).

The further question arises as to the jurisdiction of a court of chancery to entertain the present bill. Section 132 of the Criminal Code provides, that: "Any person who shall, at any time, * * * by any wager or bet upon any * * * unknown or contingent event whatever, lose to any person so * * * betting, any sum of money or other valuable thing, amounting in the whole to the sum of $10.00, and shall pay or deliver the same or any part thereof, the person so losing and paying or delivering the same, shall be at liberty to sue for and recover the money, goods, or other valuable thing, so lost and paid or delivered, or any part thereof, or the full value of the same, by action of debt, replevin, assumpsit or trover, or proceeding in chancery, from the winner thereof, with costs, in any court of competent jurisdiction." In *Kennedy* v. *Stout, supra*, in commenting upon said section 132, it was said: "If a person enter into a contract with his broker or commission man, which is a mere gambling contract, and pass to him money or property to cover losses sustained thereby, then such broker or commission man is a '*winner*,' within the meaning of section 132 of the Criminal Code; and such person is

given a remedy by such section of the statute against such broker or commission man for the recovery of such money or property. What the nature of the contract is that the broker may have entered into with some third party on the board of trade or elsewhere, is wholly immaterial or merely a circumstance of corroboration." The same doctrine was announced by this court in *Pearce* v. *Foote, supra.* (See, also, *Carroll* v. *Holmes*, 24 Ill. App. 453, and *Griswold* v. *Gregg,* id. 384).

In *Petillon* v. *Hittle*, 90 Ill. 420, it was held, that a bet on the result of an election, and the agreement growing out of the same for the stakeholder to pay the money deposited with him to the winner, were illegal and void, and that courts of chancery will assume jurisdiction to restrain the enforcement of unexecuted contracts founded on wagers or bets prohibited by law. In that case it was said, that the section of the statute, which provides that chancery may take jurisdiction when the loser sues to recover back money or property lost and paid to the winner, relates to money, property, etc., lost and paid on gaming, and not to prevent unexecuted contracts from being enforced. Here, as appellants must be regarded as the winners of appellee's securities deposited with them, section 132 is applicable so far as it provides a remedy in chancery. The property, here sought to be recovered, has already been lost and paid on a gambling transaction. (See, also, *Chapin* v. *Dake*, 57 Ill. 295; *Davidson* v. *Gibbons*, 5 Bibb. 200). We are of opinion that equity has jurisdiction to entertain the present bill.

The judgment of the Appellate Court and the decree of the circuit court are affirmed.

*Judgment affirmed.*