[No. 22970. Department One. August 7, 1931.]

WALTER G. COUGHLIN, *as Receiver of George L. Eder & Company, Appellant,* v. C. M. FERRO, *Respondent.*[1]

*Padden & Moriarty,* for appellant.
*P. O. D. Vedova,* for respondent.

HOLCOMB, J.—In January, 1929, Eder & Company was organized as a brokerage company. Their business was to purchase and sell securities for customers, charging for such service a commission, and, in case of margin accounts, also charged interest on the advancement made for the purchase of the securities for customers. The company became insolvent November 18, 1929, and appellant was appointed its receiver. Since the receiver had nothing to do with any of the transactions involved, all of them having been with Eder & Company, appellant will be spoken of briefly as Eder.

Respondent was a margin customer of Eder. His account was started May 23, 1929, and his last transactions were dated November 15, 1929. An account with Eder, showing all the transactions between them, was introduced in evidence as one exhibit. During the latter part of October, 1929, stocks which had been charged to respondent on margin dropped rapidly in value. Respondent was called on by Eder frequently for margin, and he at last notified Eder that he was unable to make further payments, the securities remaining in his account were sold at the prevailing market price, the proceeds thereof credited on respondent's account, leaving him apparently indebted for prior advancements of the broker in the sum of $370.86, for which appellant brought this suit.

Respondent defended on the theory that his transactions with Eder were gambling transactions, and therefore unlawful and void.

Respondent was a bank clerk drawing a salary of $150 per month. The only capital he had was some Transamerica stock worth $1,500, ten shares of Interstate Equities worth $600, and two shares of National Aviation worth $100, making his total resources $2,200. On a margin of $1,500, Eder purchased for respondent's account $9,952.50 of Bendix Aviation stock. The customary margin on aviation stock on behalf of Eder was fifty per cent. The margin deposited by respondent was therefore very small in comparison with the customary requirement. During the period from May 23 to November 15, 1929, respondent purchased and sold to Eder various stocks to the total valuation of $77,851.62. All purchases by respondent from Eder were on margin, and Eder, in turn, declared to have purchased the securities also on margin from E. A. Pierce & Company, a member of the New York stock exchange. Eder was not a member of any recognized stock exchange, and merely dealt through brokers in New York who were members.

The day after the first purchase by respondent from Eder, Eder sold the stock, the sale resulting in a net loss to respondent of $900. At no time was there any offer by Eder to deliver the stock purchased. At no time was there any demand for the purchase price, nor were there any inquiries made as to the ability of respondent to pay for the stock purchased, but respondent was at all times under margin.

It is also to be noted that this action is not one for the purchase price of the securities traded in, but an action for the settlement of the differences between the contract price and the market or selling price.

The trial court, at the conclusion of the evidence in the case, analyzed it, and at first announced that he would grant judgment for appellant. Respondent

thereupon moved for judgment notwithstanding the decision, or in the alternative for a new trial, on the hearing of which the court gave judgment for respondent.

The trial judge first said:

"There is evidence here that would support a finding that it is a gambling contract, and there is evidence here that would support the opposite view. It all depends on what I believe the truth in this case to be with reference to the intentions of these people. Was it the intention of these people just to gamble on margins or not?"

He then analyzed the evidence and particularly that of respondent. The evidence was referred to which showed that respondent's loss at one time amounted to about $4,000 and respondent continued to "pull down" the profits. This apparent reception of the profits (which was wholly on paper) reduced that debt down to $376.

Appellant lays considerable stress on the remarks of the court at the conclusion of the testimony, and argues, in effect, that its first judgment was better than its second.

The trial court made a finding:

"That defendant was a customer of George L. Eder & Company, Inc. That defendant herein entered into an agreement with the said George L. Eder & Company, Inc., for the purpose of speculating on the rise and fall of the stock market. That the intention of the defendant hereto was not to purchase or to sell the said stocks traded in, but to continue trading and to settle differences periodically on the basis of the difference in the market price at which said stocks were purported to be purchased and sold, and that such intention was known by plaintiff, George L. Eder & Company, Inc., and acquiesced in. That the said George L. Eder & Company understood that the defendant could not pay for the stock alleged to be purchased.

That no stock certificates were ever delivered or offered to be delivered to said defendant, but calls were made at various times for margins. That said George L. Eder & Company was at all times willing to purchase an unlimited quantity of stock on his own responsibility as long as the defendant was willing to furnish to said George L. Eder & Company sufficient margins without reference to the financial ability of said defendant. That the said George L. Eder & Company, Inc. was not a member of any recognized stock exchange and transacted business through one E. A. Pierce & Company, a partnership. That the said George L. Eder & Company, Inc., placed orders to purchase various stocks traded in through the said E. A. Pierce & Company on a margin and the said George L. Eder & Company was at no time in possession of said stock certificates and said stocks were held by E. A. Pierce & Company for the account of George L. Eder & Company, Inc.''

To this finding and the conclusion of law based thereon to the effect that appellant is not entitled to recovery herein, appellant takes vigorous exception.

The sole question before the lower court to determine was what the intention of the parties to the transaction was.

█ Relying upon the well-settled principle that the burden of sustaining allegations of this character is upon the one asserting them (*Irwin v. Williar,* 110 U. S. 499), appellant then asserts that buying and selling on margins is not unlawful. Authorities are then cited to the effect that, in order to sustain this defense, it must be proven an unlawful intention exists between both parties to the transaction. Among other authorities cited on this point are *Gettys v. Newburger,* 272 Fed. 209, and *Clews v. Jamieson,* 182 U. S. 461.

The *Gettys* case, *supra,* written by Sanborn, circuit judge, involved transactions upon the New York cotton exchange between cotton brokers at New Orleans

and men engaged in the cotton business in Oklahoma. The opinion contained an excellent review of the decisions by the supreme court and other Federal courts, and among other things said:

"A careful reading, comparison, and study of the pertinent opinions of the Supreme Court leads to the conclusions that: It is only when under the guise of a legal contract for the purchase or sale of goods to be delivered at a future time such as those here in evidence, parties to it really intend, when the contract is made, that its obligations shall be discharged by the payment by one party to the other of the difference between the contract price and the market price of the goods at the date fixed in the contract for performing it that the transaction becomes a wager and unlawful, and that it is only when a broker employed to make the contract participates in or is aware of such an intention of both parties thereto that his account for advances or commissions becomes unenforceable."

A number of cases from the supreme court are cited, including the *Irwin* case, *supra*, which is quoted as follows:

" 'If, however, at the time of entering into a contract for a sale of personal property for future delivery it be contemplated by both parties that at the time fixed for delivery the purchaser shall merely receive or pay the difference between the contract and the market price, the transaction is a wager, and nothing more.'

"It has been often correctly said . . . that if the parties, at the time the contract is made, have the intention: First, to discharge their obligations under the contract by the payment of the difference between the contract price and the market price at the time fixed in the contract for its performance; and, second, if they also have the intention not to deliver, receive, or pay for the commodity at the time fixed for its delivery in the agreement—the contract is a wager and illegal. But the only intention indispensable to the existence of the wager is the first one. If that inten-

tion exists at the time the contract is made it is a wagering contract whether the second intention exists or not, because there is no way consistent with the laws and the public policy against wagers that the first intention can exist at the time the contract is made without a violation of the laws and public policy against wagers.''

In the *Clews* case, *supra,* distinction was made between it and the *Irwin* case, and the principle was reiterated that, in order to invalidate a contract as a wagering one, both parties must intend that, instead of the delivery of the article, there shall be a mere payment of the difference between the contract and the market price. See, also *Bibb v. Allen,* 149 U. S. 481.

But the intention of the parties may be determined from a variety of circumstances. It may be determined from the nature of the transactions and the manner and method of carrying on the business. The pecuniary ability of the alleged purchaser may be considered. The fact that calls for margins are made is to be deemed an important factor. The fact that the settlement of differences between the contract price and the market price is disclosed by the transactions between the parties, is also an important element. *Jamieson v. Wallace,* 167 Ill. 388, 47 N. E. 762, 59 Am. St. 302; *Waite v. Frank,* 14 S. D. 626, 86 N. W. 645.

In the *Jamieson* case, *supra,* after referring to how the intention of the parties may be determined, the court said:

''Among these circumstances, besides the mode of dealing between the parties, is the pecuniary ability of the party purchasing. If the purchases of a party, as ordered through a broker, are larger in amount than he is able to pay for, it is a strong circumstance indicating that there was no intention of receiving the property, but rather an intention to settle the difference between the market price and the contract price. Such intention may be also inferred where the party,

making the purchase, never calls upon the party, ordering the purchase, for the purchase money, but only for margins. It makes no difference, whether the real intention is formally expressed in words or not, if the facts and circumstances in proof show, that it was the real understanding, that there should be no actual purchase and no delivery or acceptance of the property involved in the contract, but merely an adjustment of damages upon differences."

It is to be noted in this case that the financial ability of respondent to pay for the stocks ostensibly purchased through Eder, had the stock been tendered for delivery to him, was but a fractional part of their market price. Margins were repeatedly called for by Eder. There was a bookkeeping settlement of the differences between the market price and the contract price repeatedly on the books of Eder.

27 C. J. 1053 is quoted by appellant to the effect that

"Speculation is not necessarily gambling. In the absence of some constitutional or statutory provision to the contrary, a contract for the sale of stocks or other commodity to be delivered at a future day is valid, even though the seller has not the goods and has no other means of getting them than to go into the market and buy them before the day of delivery, provided that the parties really intend that the goods are to be delivered by the seller and that the price is to be paid by the buyer. If the contract contemplated actual future delivery, it is lawful, although no such delivery is in fact made."

The same text gives the general rule, p. 1055, as follows:

"If, however, under the guise of a contract of sale the real intent of both parties is merely to speculate in the rise or fall of prices, and the property is not to be delivered, but at the time fixed for delivery one party is to pay to the other the difference between the

contract price and the market price, the whole transaction must be considered as a wager and invalid.''

Besides the foregoing authorities, we have a statute defining bucket-shops, which precisely defines the business of Eder. This statute prescribes a severe penalty for its violation. Rem. Comp. Stat., §§ 2475 and 2476. Under this statute, in *Glasgow v. Nicholls,* 124 Wash. 281, 214 Pac. 165, 35 A. L. R. 419, we held such contracts void where a brokerage firm was engaged in buying and selling stocks and bonds, and other commodities on margins and credit, without any intention of receiving or paying for the property, the transactions being closed upon the basis of market prices quoted by some board of trade or stock exchange, and margins were deposited to cover fluctuations in prices.

Some of the cases cited by appellant, which have not been discussed, are distinguished by the absence of statute, or the existence of statutes legalizing such transactions.

Owing to the importance of the legal question involved, we have devoted more space to the discussion of this case than the amount in suit would justify.

The finding set out, made by the trial court, is manifestly in strict accord with the facts. The conclusion of law made by the court and its judgment necessarily followed.

We conclude the judgment is right and must be affirmed.

TOLMAN, C. J., MITCHELL, PARKER, and MAIN, JJ., concur.